## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARTIN GILLIAM,

     *Plaintiff,*

*v.*                     CASE NO. 2:14-cv-12335

CAROLYN W. COLVIN        DISTRICT JUDGE VICTORIA A. ROBERTS
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, and for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18.)

Plaintiff Martin Gilliam was fifty-three years old when he applied for benefits on January 27, 2011, alleging that he became disabled on December 22, 2008. (Transcript, Doc. 10 at 155, 162.) His work history includes jobs as a maintenance crew supervisor from 1989 to 1999 and as a disc jockey from 1992 to 2008. (Tr. at 204, 227.) At the initial administrative stage, the Commissioner considered whether he was disabled by his ischemic heart disease and a secondary diagnosis of "obesity and other hyperalimentation." (Tr. at 62-63.) Neither impairment, alone or combined, was found to be disabling. (*Id.*) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (Tr. at 94-95.)

ALJ Kevin J. Detherage convened the hearing on November 7, 2012. (Tr. at 25-61.) In his decision filed the following month, the ALJ found that Plaintiff was not disabled. (Tr. at 13-20.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on April 17, 2014, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On June 13, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.    Standard of Review**

Applicants for Social Security benefits go through a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual

2

determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247

(6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a

4

conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.     Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85.

Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since December 22, 2008, and met the insured status requirements through December 31, 2011. (Tr. at 15.) At step two, the ALJ concluded Plaintiff had the following severe impairments: "Heart Disease and Chronic Obstructive Pulmonary Disease (COPD)." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 16.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in the regulations, 20 C.F.R. §§ 404.1567(b), 416.967(b), with additional limitations. (Tr. at 16-19.) The Plaintiff had no past

relevant work to analyze at step four. (Tr. at 19.) Finally, at the last step, the ALJ found that a significant number of jobs existed suitable to Plaintiff's limitations. (Tr. 19-20.)

###    E.    Administrative Record

###    1.    Medical Evidence

Plaintiff was sitting on his couch on December 22, 2008, when his chest began to ache, the pain shooting down his left arm as well. (Tr. at 461, 566.) The paramedics found him breathing heavily while grasping his chest and they brought him to the hospital. (Tr. at 445, 461.) At Ostego Memorial Hospital, he appeared in "severe distress." (Tr. at 444.) A second assessment completed a few minutes later found him in "moderate" distress with "moderate" respiratory difficulties, but his pulse was strong and he remained mentally oriented. (Tr. at 445.) Those notes also state he was obese and smoked one pack of cigarettes per day. (*Id.*) The doctors diagnosed an "anterior lateral myocardial infarction" (Tr. at 521, 567), performed a "successful" angioplasty, and placed a heart stent in Plaintiff (Tr. at 277, 520, 522), before Plaintiff was discharged on December 24. (Tr. at 35.)

Two weeks later he returned for a checkup, denying any chest pain or shortness of breath. (Tr. at 521.) He could not yet exercise, but he had modified his diet to lose weight. (Tr. at 522.) A chronic cough continued to plague him. (Tr. at 524.) The examination notes indicate his gait was steady, his neck had a full range of motion, his lungs sounded "clear" and his breathing was unlabored, his heart rate and rhythm were normal, his musculoskeletal system displayed full range of motion, and his strength was normal. (Tr. at 525-26.)

Over the following months, however, he began to experience chest pain (Tr. at 322-23, 234-35), but it often "[r]esolved spontaneously." (Tr. at 517.) By February, his fatigue had

improved, he experienced some dizziness, and walking caused him to lose his breath; the examination found his breathing was clear and his heart rate was "slightly slow" but regular. (Tr. at 519.) The results of a stress test during March indicated his heart had normal functional capacity, and his response to exercise was appropriate. (Tr. at 582.) The test only consisted of four minutes of exercise, though, and the notes say the chest paint was "limiting," without further explanation. (*Id.*)

At a three month follow-up visit in April he mentioned having "some numbness and tingling in his left arm" and shortness of breath when walking, though the latter problem had not recently grown any worse. (Tr. at 513.) His breathing was clear, his gait remained steady, and he had regular heart rate and rhythm. (Tr. at 514.) The nurse suggested that he should not work until his chest pain had resolved. (Tr. at 515-16.) In May he reported he felt "better" despite some continuing tightness and dizziness. (Tr. at 509-10.) He lost his breath only "with too much activity." (Tr. at 510.) At an appointment in May, his heart rate and rhythm were regular and his breathing clear. (*Id.*) He shot rifles at a range and walked for exercise each week; the examiner encouraged him to walk every day. (Tr. at 512.)

In June he went to the hospital for another follow-up feeling lightheaded. (Tr. at 310, 506.) During the examination he denied chest pain or pressure and said he had no respiratory issues. (*Id.*) The examiner noted he was "stable," and observed his steady gait and clear breathing. (Tr. at 310-11, 507.) They concluded that he should discontinue one of his medications, look into smoking cessation, and have an electrocardiogram ("ECG") completed. (Tr. at 313, 508.)

He returned to the hospital on August 17, 2009, after coughing up blood earlier in the day. (Tr. at 276, 289.) The notes indicate he was experiencing chest or left arm pain too (Tr. at 267-68, 276, 292, 297), but apparently he told the personnel at admission that "I came here cause I coughed up blood." (Tr. at 276, 301, 306.) When asked if he had any pain, he responded "No," and measured his discomfort at level "zero" on a Visual Analog ("VA") scale. (Tr. at 279; *see also id.* at 274, 306.) In his activities of daily living, he considered himself "[i]ndependent." (Tr. at 275.) At intake, he was alert and had no muscle weakness. (Tr. at 292-93, 297-98, 301.) He estimated his smoking was down to half a pack per day, and added that he drank alcohol every day, usually taking two to three shots of whiskey at the bar where he worked part-time. (Tr. at 278.) He generally experienced "moderate" stress and when it grew worse he would "go out in the woods and burn one."[2] His gait appeared normal and he admitted his health problems did not affect his mobility, though he lost his breath "with long distances." (Tr. at 279.)

On examination, his breathing was unlabored and clear and his extremities were strong. (Tr. at 279, 283, 302.) They arranged for an overnight stay to monitor his progress and he reported the next morning that he "slept well" and had "no complaints of pain or discomfort." (Tr. at 285.) He left later that day with diagnoses of "left arm pain," acute bronchitis, and a history of hyperlipidemia and coronary artery disease manifesting in angina. (Tr. at 267-68, 289.) The cardiac tests yielded normal results, however, and the chest x-ray likewise gave the doctor no concerns. (Tr. at 268, 319-20.)

---

[2] Presumably, "burning one" means smoking marijuana, or perhaps a cigarette. *Burn One*, Urban Dictionary, http://www.urbandictionary.com/define.php?term=burn+one (last visited April 9, 2015). He admitted to smoking one to three joints a day. (Tr. at 522, 532.)

10

He began coughing up blood again in September, telling hospital staff that perhaps his air conditioner "dry[s] him out too much which caused him to start coughing . . . ." (Tr. at 260.) By the time he went to the hospital, however, there was no longer any blood in his sputum. (*Id.*) As before, his gait remained steady and his breathing clear. (Tr. at 261.) The examining nurse advised him to quit smoking and to return if his sputum contained blood. (Tr. at 262.)

Plaintiff's next cardiology appointment came in April 2010. (Tr. at 243, 495.) Apparently, in the meantime, he had not followed up as instructed; at his last appointment with the Cardiology Clinic in May 2009, he was told to return in three months, which he failed to do. (*Id.*) Instead, reporting back in April 2010, he said that after experiencing a solid recovery after the surgery, his condition had recently begun to deteriorate with recurring left arm tightness, chest pain, fatigue, edema, and shortness of breath. (Tr. at 243-44, 249, 496-97.) He associated the left arm pain with the chest tightness. (Tr. at 496.) He relied more frequently on sublingual nitroglycerine to prevent the chest pain. (Tr. at 243, 496.) Frequent walks through the woods were providing him more exercise, and he had continued to make improvements in his diet: Since his heart attack in December 2008, he had lost over fifty pounds. (Tr. at 244-45, 496-98.) He rated his pain at level four-out-of-ten on a VA scale. (Tr. at 249.) On examination, his breathing again sounded clear, his legs were free of edema, and, of his two primary heart sounds, the first was normal and the second "slightly" slow. (Tr. at 244, 497.) The diagnostic tests confirmed the slowed heart rate. (*Id.*) The nurse planned to order more stress tests, advising him to avoid "anything strenuous" until they were complete and also recommending he stop smoking. (Tr. at 245, 498.)

Nearly a year later, in March 2011, Plaintiff went to the emergency room with worsening chest pain. (Tr. at 328, 331, 541.) The pain had been "off-and-on" for a week prior, sometimes radiating to his left arm and causing dizziness, palpitations, and shortness of breath. (*Id.*) Upon his arrival, he estimated that the pain was at level four on a VA scale, and subsequently ceased altogether when given medications at the hospital. (Tr. at 328, 433.) His cigarette smoking had crept up to one pack per day again. (Tr. at 435.) The examination found normal results except a slowed heart rate, which an ECG confirmed, and laboratory testing results were within acceptable ranges, including a stress test. (Tr. at 329, 331-32, 402, 427, 430, 431, 531, 541-42, 544.) During the stress test he reported no chest pain and while he had "some shortness of breath," the doctor did not think this was "unexpected for a smoker." (Tr. at 402, 430, 536, 546.) He had a normal range of movement, clear breathing, was functionally independent, and his gait was not unsteady. (Tr. at 329, 433-35.) The doctor ruled out another myocardial infarction and decided to continue treating him with medication. (Tr. at 328-29, 533-34, 542-43.) The notes also state that Plaintiff was "currently not working, since he had the [heart attack] in December of 2008,"[3] and he or his wife marked down "self employed" on the intake forms. (Tr. at 440.)

After this incident, he reported to his primary caregiver, a nurse practitioner at the Veterans Affairs clinic. (Tr. at 42, 491.) He denied chest pain during the visit, but mentioned recurring shortness of breath. (*Id.*) The examination results mirrored almost all others—steady gait, clear breathing, normal heart rate by some measures, slowed in others—and the doctor encouraged him to follow up with his cardiologist. (*Id.*) He did so later in March, returning to

---

[3] The comma after "working" makes it unclear whether the note-taker meant that Plaintiff had not worked since the heart attack, or that he was not now working because of the heart attack.

the Cardiology Clinic after not having visited there since his last appointment in April 2010. (Tr. at 488.) He mentioned the recent pain in his left arm, but "denied chest pain, pressure, tightness or heaviness." (*Id.*) Plaintiff explained that an "old car accident" had resulted in a left shoulder injury, adding that lying on his left side hurt and he could not raise that arm above his shoulder without increasing the pain. (*Id.*) Laboratory tests revealed "excellent lipid control" and a "chest x-ray showed a normal-sized heart without convincing evidence of infiltrate, effusion, or pneumothorax." (*Id.*; Tr. at 527.) The examination results were normal and Plaintiff's diet remained healthy; however, he had been "quite sedentary this winter" and had begun smoking one pack of cigarettes per day again. (Tr. at 489-90.)

The following month, April 2011, Plaintiff saw Dr. R. Scott Lazzara for a consultative examination arranged to help the Commissioner determine whether Plaintiff was disabled. (Tr. at 347-53.) Plaintiff said his chief impairments were the heart attack, artery disease, lung disease, and obesity. (Tr. at 349.) Each day he took a variety of medications, and he also used nitroglycerine as needed. (*Id.*) The chest pain occurred occasionally, generally after exertion, spreading to his left arm and lasting a few minutes each time. (*Id.*) For the past fifteen years, Plaintiff stated, he had dealt with emphysema and now treated it with Albuterol every six hours. (*Id.*) His smoking was down to three-quarters of a pack per day, a drop from the two-pack-per-day habit he had for forty-years. (*Id.*) Plaintiff reported that he still coughed but it did not produce sputum. (*Id.*) Before the heart attack in 2008, Plaintiff had worked in factories and other maintenance jobs; afterwards, he tried to work as a disc jockey but could not lift and carry the equipment. (*Id.*) Now, he could drive, cook, feed his rabbits with the help of his daughter, who carried the food, and occasionally hunt and fish. (*Id.*) His limits in all of these

13

tasks, he estimated, were walking 100 yards before fatigue set in and lifting twenty pounds. (*Id.*)

Dr. Lazzara then performed a physical examination, the most thorough one in the record. (Tr. at 350.) Plaintiff's exhales were prolonged, and Dr. Lazzara heard "mild bronchial breath sounds that are clear . . . ." (*Id.*) His heart rate and rhythm were normal, no edema appeared, and his neck was supple. (*Id.*) His musculoskeletal tests showed

> no evidence of joint laxity, crepitance, or effusion. Grip strength remains intact. Dexterity is unimpaired. The patient could pick up a coin and open a door. The patient had no difficulty getting on and off the examination table, no difficulty heel and toe walking, mild difficulty squatting, and mild difficulty hopping. . . . There is no paravertebral muscle spasm.

(*Id.*) The range of motion in his joints was normal, as demonstrated by two pages describing how far he could bend and stretch at each joint. (Tr. at 350-52.) Further, Dr. Lazzara found that Plaintiff's "[m]otor strength and tone are normal," his "[r]eflexes are intact and symmetrical," and he "walks with a normal gait without the use of an assist device." (Tr. at 353.) In his conclusions sections, the doctor noted his suspicion that Plaintiff's "continued chest pain . . . is more pulmonic," stemming from his COPD. (*Id.*) Plaintiff's blood pressure was "borderline elevated," but he did not have "other findings of heart failure." (*Id.*) Out of a long list of physical abilities, such as standing or climbing stairs, Dr. Lazzara recommended only one limitation: that Plaintiff not carry, push, or pull more than forty pounds. (Tr. at 347.) "His degree of impairment appears mild to moderate. His prognosis is fair but stable," Dr. Lazzara concluded. (Tr. at 353.)

A second consultative examination with Dr. Lazzara took place a few months later, on June 21, 2011. (Tr. at 355-57.) This time, they focused on his respiratory problems. (*Id.*)

14

Plaintiff now contended that his persistent cough produced sputum, still denying however that it contained blood. (Tr. at 355.) He had smoked one pack of cigarettes per day for forty years, contrary to his earlier statements. (*Id.*) The notes indicate Plaintiff complied with inhaler prescriptions he had previously received. (Tr. at 357.) The examination results were largely unchanged, though this time Dr. Lazzara did not note any bronchial sounds. (Tr. at 356.) The spirometry tests that were conducted to measure Plaintiff's lung capacity yielded "normal" results. (Tr. at 357.) Overall, Dr. Lazzara concluded that Plaintiff's "cardiopulmonary impairment appears to be mild; prognosis [is] fair but not actively declining." (*Id.*)

In June 2011, Plaintiff had a follow-up examination with his primary caregiver and reported he was "doing well except for his left shoulder," which had been experiencing increased pain especially with movement. (Tr. at 484.) He denied chest pain or shortness of breath, however, and the examination notes indicate he had a steady gait, clear lungs, unlabored respirations, and regular heart rate and rhythm. (Tr. at 484-85.) His left shoulder's range of motion was limited. (*Id.*) The plan was to continue his medications and order x-rays of his shoulder. (Tr. at 487.)

In July 2011, Dr. Eric VanderHaagen, reviewed Plaintiff's medical records and offered an assessment of his functional capacities. (Tr. at 69-70, 78-79.) Plaintiff could occasionally (one-third or less of a workday) lift twenty pounds, frequently (two-thirds or more of a workday) lift ten pounds, stand or walk for six hours during a workday, sit for the same amount, and push and pull without limitation. (Tr. at 69, 78.) He based this on, among other things, Plaintiff's relatively stable coronary artery disease, which had only a "slightly decreased" ejection fraction of forty-one percent, and his normal pulmonary functioning tests.

15

(Tr. at 69-70, 78-79.) And while Plaintiff should never crawl or climb ladders, ropes, and scaffolds, and only frequently climb ramps or stairs, he had no other limitations. (Tr. at 70, 78-79.)

Plaintiff had his annual examination with his primary doctors on September 2011, the first time he had seen them since his June 2011 checkup. (Tr. at 624.) For exercise, he had been walking for under thirty minutes, which either he or the nurse described as "Mild." (Tr. at 629.) His pack-a-day smoking habit remained and his chief complaint was increasing shortness of breath over the last half-year. (*Id.*) The notes then become less clear, but suggest his chest was hurting too: "He said it takes some nitroglycerin, which has been very effective for the chest pressure. He denies any new illnesses, or problems. He is concerned that he is having the chest pressure coming back is starting [sic] to feel like what he had before." (*Id.*) However, at the visit he assessed his pain at "less than 4" on a VA scale. (Tr. at 631.) The examination results were unchanged from before; he walked steadily, breathed clearly, and had regular heart rate and rhythm. (Tr. at 624-25.) He further claimed that he had "[n]o difficulties" with mobility. (Tr. at 629.) In October, though he was still complaining of chest pressure and shortness of breath, he admitted that the nitroglycerine provided "effective" relief for both. (Tr. at 604, 612.) The testing done during the visit returned normal results, with only a "mildly depressed" left ventricular ejection fraction rate. (Tr. at 605.)

## 2.    Application Reports and Administrative Hearing

Plaintiff completed a function self-report form in March 2011. (Tr. at 192-99.) His primary limitations were inability to "lift much weight and carry any distance due to [his] shortness of breath," the lightheadedness that occurred when he exerted himself, his inability to

16

walk long distances due to leg pain, his left-hand numbness and the resulting manipulative deficiency, and his general shortness of breath and chest pressure. (Tr. at 192.) Of various physical abilities, his conditions limited lifting, squatting, bending, standing, walking, kneeling, using his hands, and climbing stairs, but not reaching or sitting. (Tr. at 197.) He could walk five to ten minutes before resting. (*Id.*) While he did not mark that he had any hearing problems, he mentioned that he used a hearing aid in his left ear after an accident occurred when he was in the United States Marine Corps. (Tr. at 197-98.) As for mental tasks, he had trouble completing tasks and remembering to take his medication. (Tr. at 197.) His medications did not cause any side effects. (Tr. at 199.)

During a typical day, he fed his rabbits, read, followed the news, prepared a quick meal for himself and his wife, watched television, and tried to figure out "a way to make a living." (Tr. at 193.) His wife or daughter also helped with the rabbits, carrying out their water and cleaning the pens. (*Id.*) Personal care and keeping track of finances presented no difficulties, but he needed reminders to take his medication. (Tr. at 194-95.) The meals he cooked, about three times per week, took five to ten minutes and were much easier to complete than the full meals he used to prepare before his condition worsened. (*Id.*) Around the house, he mowed the lawn, sometimes in increments if the outdoor dust was particularly troublesome, and did "[l]ight" repairs; all of this took him fifteen to thirty minutes "every day or as needed." (*Id.*) He could drive and ride in cars, and leave the house alone. (Tr. at 195.) About once a month he would shop for groceries with his wife, taking an hour or two, though if he "got feeling bad" he would wait in the car. (*Id.*) Along with reading and watching television, he occasionally

17

enjoyed target shooting and hunting. (Tr. at 196.) He had no regular social events but he spent time with others when they visited or by phone. (*Id.*)

At the administrative hearing in November 2012 Plaintiff testified that he lived with his wife. (Tr. at 29-30.) The last paying job he had was in December 2008 as a self-employed disc jockey, working three nights per week. (Tr. at 30.) When he started disc-jockeying in 1992, his full-time job was on a maintenance crew with the Michigan Department of Natural Resources, a demanding position that required him to lift anywhere from twenty to seventy pounds of rock, lumber, and other materials. (Tr. at 31-32.) Eventually, that became seasonal, running from April to September each year. (Tr. at 33.) He stayed in that job roughly from 1989 until 1999, when the doctors noticed problems on his ECGs and "suspected that [he] had had a slight heart attack, but they weren't sure." (Tr. at 32-33.) As a result, "[t]hey decided that I didn't need to be doing that [job] anymore." (Tr. at 32.) "They" were presumably his company, as he mentions that "the colony and them didn't want responsibility or the liability of something happening while I was working." (*Id.*) He later testified that at the end of one season, after his doctors told him to take time off, his employer "more or less decided that they were done" and that they would not "bring [him] back the following spring." (Tr. at 33-34.) The disc-jockeying work continued, however, and he would lift twenty to seventy pounds at his events, spending the whole time on his feet. (Tr. at 34.) He stopped that only after his 2008 heart attack, when he was told that his condition imposed restrictions that would prevent him from continuing. (*Id.*)

Also resulting from his heart attack was left arm pain and immobility; most of the time, he said, his arm and hand tingled and stayed numb, though they did not hurt. (Tr. at 35-37.)

18

These feelings resembled his conditions immediately before his heart attack. (Tr. at 49.) Consequently, he could not use his left arm to grasp items, such as coffee cups or dinner plates, or even use the computer with it, relying instead on his right, which was his dominant side anyway. (*Id.*) Despite his consistent complaints about this issue, his doctors had never given him a "direct answer on it," or even done any evaluations, yet they had told him not to reach above his head because of his heart condition. (Tr. at 36-37, 50.) Other actions hurt his hands too, such as reloading guns, and caused them to swell. (Tr. at 46-47.) It took a few hours before they became usable again. (Tr. at 47.) His left shoulder, unlike his arm and hand, did hurt when he tried to lift with it. (Tr. at 37.) He thought this was a separate problem from his heart issues. (Tr. at 50.) In the mornings, he claimed, he woke with swollen and aching hands; but the doctors had not prescribed any medication for this or for his shoulder pain. (Tr. at 38.)

He claimed additional problems as well. He took medication for gastrointestinal reflux disease, he stated. (*Id.*) Additionally, his legs bothered him—just reaching the mailbox was a struggle, and he estimated that a mere twenty yards of walking left him out of breath. (*Id.*) He often propped up his legs, "probably [for] a couple hours a day" (Tr. at 48), "to get the pain to go away and the swelling to go down in [his] legs and ankles." (Tr. at 35.) The swelling and pain came from restless leg syndrome, which he claimed that the doctors had diagnosed after his heart attack. (Tr. at 39.) If he moved around a lot during the day, they would swell, though sometimes the swelling occurred even if he just sat; most days, they hurt at some point. (Tr. at 47-48.)

He also had consistent heart palpitations. (Tr. at 48-49.) They occurred "several times a week," Plaintiff said, and there was neither a typical precipitating event nor anything he could

do to relieve the pain. (*Id.*) The dizziness occurred regularly and on four or five occasions since the heart attack he had passed out. (Tr. at 49.) The COPD caused shortness of breath after even minimal exertion, such as getting undressed for bed. (Tr. at 50-51.) Asked about his smoking, he claimed to have cut back "[q]uite a bit," from three packs per day before the heart attack to "maybe a half a pack or so" now. (Tr. at 51.) Yet, despite this improvement, his breathing troubles grew worse. (*Id.*)

He had attempted to find work after 2008, "but there's nothing I can do," he told the ALJ. (*Id.*) "The doctors have never released me to go back to work since my heart attack. I'm limited to what I can lift," he said, adding that the doctors "told me not to lift any more than five pounds." (*Id.*) Additionally, he could stand or sit for only one-half hour before his legs hurt and he had to change positions. (Tr. at 40.) He could dress himself, prepare simple meals, and go outside, usually to sit on his deck. (Tr. at 41.) However, he did not do any household chores since the heart attack and he did not shop. (*Id.*) Generally he spent the day watching television or doing puzzles. (Tr. at 43.) He left his house only for appointments, otherwise he remained at home and socialized only "[o]nce in a while," when friends or family visited. (*Id.*)

The ALJ then asked him if he could work in positions that allowed him to sit or stand, as he chose, and did not require "much lifting[.]" (Tr. at 44.) "I don't know," he replied, "I don't believe so, no," explaining that he was "not supposed to lift my arms over my head" and that he grew lightheaded when standing up quickly or bending (*Id.*) Plaintiff then confirmed that his chest pain occurred several times per week since his heart attack, requiring him to take nitroglycerin tablets each time. (Tr. at 45.) During these episodes "it helps to sometimes just sit back," he explained, especially because the pain drained his energy. (Tr. at 45-46.) Recovering

20

from the pain sometimes took a couple hours, others times he rested the whole day. (Tr. at 46.)

The combination of impairments and symptoms often left him fatigued and weak. (Tr. at 51.)

At his most recent visit, his primary care physician increased his heart medications because, he

said, they believed his heart was becoming weaker. (Tr. at 52.)

The ALJ then questioned the vocational expert ("VE"). (Tr. at 54-55.) She first testified

about Plaintiff's previous jobs, describing their relevant vocational criteria and noting that they

did not provide transferrable skills. (Tr. at 55-56.) The ALJ asked her to consider a

"[h]ypothetical individual with the past jobs that you described and further assume that the[]

hypothetical individual has a residual functional capacity to do light work, which is unskilled,

could the hypothetical[] individual perform any kind of job you described as actually

performed or normally performed in the national economy?" (Tr. at 56.) "No," she replied,

adding that he could nonetheless perform other jobs in the national economy, including small

product assembler (900 positions in the region), garment sorter (1000 positions in the region),

and agricultural produce sorter (900 positions in the region). (Tr. at 57.)

The ALJ added additional limitations on the same hypothetical individual's abilities: he

could

> occasionally stoop, kneel, crouch or crawl, can never climb ladders, ropes or
> scaffolds, can occasionally climb stairs or ramps, can avoid concentrated
> exposure to dust, gasses, odors, fumes, and fully ventilated areas, . . . [must]
> be allowed to sit or stand at will, provided that individual is not off task more
> than 10 percent of the work period, and can frequently reach in any direction,
> including overhead with the left upper extremity.

(Tr. at 57-58.) The VE testified that this hypothetical individual could perform the same

positions in the same numbers as the first individual. (Tr. at 58.) However, if that person was

absent from work more than three days per month, he could not sustain employment. (Tr. at 59.) Also, he could not work if his hands were swollen for up to two hours during the day, rendering them unusable, or if he needed to elevate his legs for a few hours each day. (Tr. at 60.)

### F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ determined that Plaintiff had the RFC to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he requires a sit-stand option at will provided that he is not off-task more than 10% of the work period. He can frequently reach with his left upper extremity. The claimant can occasionally stoop, kneel, crouch, crawl, or climb stairs or ramps but never climb ladders, ropes, or scaffolds. He must avoid concentrated exposure to dust, gasses, odors, fumes, or poorly ventilated areas.

(Tr. at 16.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff crams a host of arguments into the four pages of his brief devoted to laying out his case. (Doc. 12 at 11-14.) Nearly all contend that the ALJ's decision lacked any analytical rigor, instead attaching unexplained conclusory statements to a regurgitation of the medical records. (*Id.*) "The ALJ's lack of discussion is astounding," Plaintiff contends, "It is completely lacking; it lacks discussion, it lacks rationale, and it lacks any due process a disabled claimant would expect from an ALJ denying their [sic] claim."[4] (*Id.* at 11-12.) He makes this case most clearly in his argument that the ALJ violated Social Security Ruling 96-8p, 1996 WL 374184 (1996), which requires ALJs to provide a narrative explanation of their findings. (*Id.* at 11, 14.) A symptom of this shoddy analysis, according to Plaintiff, is a woeful RFC that fails to incorporate all of Plaintiff's relevant limitations. (*Id.* at 11-12.) "There is not a scintilla of evidence to support . . . [the] RFC," he concludes. (*Id.* at 12.) Plaintiff particularly hammers the point that the RFC contains no non-exertional restrictions. (*Id.* at 11.)

The third argument Plaintiff hints at is encapsulated in two brief sentences, appended to another paragraph, arguing the ALJ erred by relying on Dr. VanderHaagen's opinion. (*Id.* at 11-12.) Next, and more substantially, he takes issue with the ALJ's credibility analysis. (*Id.* at 12-13.) Specifically, he questions the propriety of a boilerplate assertion in the written decision

---

[4] This is one of two cursory references to due process (*Id.* at 11, 13), and Plaintiff's brief cannot reasonably be read to contain a due process claim.

that suggests the ALJ formulated the RFC first, then used it to establish Plaintiff's credibility, which gets the process completely backwards. (*Id.* at 12.) And again, the credibility analysis suffers from the ALJ's disinclination to analyze. Here is that argument in full:

> The ALJ states that he does not find claimant credible; however the ALJ never discusses or evaluates Mr. Gilliam's subjective complaints under 20 CFR 416.929(c). . . . Such factors as fatigue, medication side effects, daily activities, and pain symptoms are never discussed in the ALJ decision. While not necessary to discuss every factor, the ALJ does have a duty to discuss more than the cherry-picked facts he misrepresents throughout his decision. All of the above is reversible error. The ALJ provides no specific reasons or analysis for how he reached these limited conclusions. There is no explanation on why the ALJ rejected the non-exertional limitations mentioned above. There is never a discussion of why or how the ALJ gave the RFC determination he gave. In short, there is no discussion, no rationale, and zero due process in the ALJ's decision.

(*Id.* at 12-13.) Finally, Plaintiff argues that the ALJ should have used the Medical Guidelines to find him disabled. (*Id.* at 13-14.) The argument, explained more below, is that the ALJ employed the Guidelines "mechanically" in violation of 20 C.F.R. § 404.1563(a) by treating Plaintiff as a fifty-four-year-old even though he was almost fifty-five years old. (Doc. 12 at 13-14.) Had the ALJ used the Guidelines with the flexibility they envision, they would have mandated a finding Plaintiff was disabled.

### a.   Medical Source Evidence, Plaintiff's Credibility, and the RFC

#### i.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. §

404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The regulations do not prescribe any similar test for

25

opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. Nonetheless, both the Sixth Circuit and the Commissioner require ALJ's to apply the factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[5] and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a

---

[5] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons

for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.

1986). The ALJ ascertains the extent of the work-related limitations by determining intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at

542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.")))；*Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed

30

prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### ii.    96-8p Narrative Discussion

Plaintiff's first argument exemplifies his brief's recurring theme: The ALJ failed to provide actual analysis of the evidence, violating SSR 96-8p. (Doc. 11, 14.) That Ruling establishes narrative discussion requirements that force ALJs to explain and justify their RFC. In particular, it states that the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence," and describing "the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." SSR 96-8p, 1996 WL 374184, at *7. Additionally, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence . . . were considered and resolved." *Id.* To meet these demands, the ALJ should offer "a thorough discussion" of the evidence and "a logical explanation" of the symptoms' effects on the individual's capacity to work. *Id.* These requirements preclude an ALJ from simply stating that his conclusion "was 'based on the medical evidence.'" *Payne v. Comm'r Soc. Sec.*, 402 F. App'x 109, 117-18 (6th Cir. 2010) (quoting the district court's opinion and finding the narrative sufficient because the ALJ did more than say the opinion was supported by evidence).

The difficulty for reviewing courts arises when the ALJ thoroughly reviews and recites the evidence but fails to engage it. In such a case, the ALJ has clearly considered the evidence.

But the Ruling requires the ALJ to do more than simply condense the record, and a court does not merely review an ALJ's ability to regurgitate facts but rather examines the cogency of the ALJ's analysis. Thus, the ALJ must "build a logical bridge between the facts of the case and the outcome," *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), and discuss "how the ALJ reached her decision regarding the RFC assessment." *Harvey v. Comm'r of Soc. Sec*., No. 14-cv-10614, 2014 WL 5465531, at *9 (E.D. Mich. Oct. 28, 2014). After citing the evidence, the ALJ must "take the next step and explain how such evidence signified an ability to perform" at the RFC's level. *Duderstadt v. Colvin*, No. 3:13cv00302, 2014 WL 3508897, at *8 (S.D. Ohio July 15, 2014), *Report & Recommendation adopted by* 2014 WL 4829498, at *3 (S.D. Ohio Sept. 29, 2014). Where the "analysis is slim," courts reverse. *Acton v. Comm'r of Soc. Sec.*, No. 13-14249, 2014 WL 6750595, at *11-13 (E.D. Mich. Dec. 1, 2014) (adopting Report & Recommendation). In contrast, the analysis suffices if it adequately addresses the evidence by, for example, pointing to a medical opinion that supports the RFC's exertional limitation. *See Cangialosi v. Comm'r of Soc. Sec.*, No. 13-10210, 2014 WL 1260711, at *6 (E.D. Mich. Mar. 27, 2014); *see also Adams v. Comm'r of Soc. Sec.*, No. 1:10-CV-503, 2011 WL 2650688, at *3 (W.D. Mich. July 6, 2011).

The narrative requirement does not set a definite quantum of analysis that must be present in the decision. Some records give the ALJ less to engage, offering fewer inconsistencies or disputed points. To describe the evidence in such cases is nearly to decide the case itself. The present case does not quite fall into that category, but the record is straightforward and did not require elaborate discussion. Plaintiff unfortunately suffered a heart attack in 2008 and has dealt with the repercussions since. Yet, the record shows only one

emergency visit for the heart attack and one other for chest pain, which thankfully was not another heart attack.[6] (Tr. at 328, 461.) Both episodes required brief stays in the hospital and, from all one can tell, resulted in relatively quick recoveries. Otherwise, his medical evidence consists of routine visits to his doctors, or more commonly a nurse practitioner, where the examinations and diagnostic testing uncovered no alarming impairments. Those notes may establish ongoing complaints, but the content of those complaints does not suggest severe limitations. Further, the medical opinion evidence offers consistent support to the ALJ, without any conflicting opinions to disentangle.

While the ALJ's specific analyses are addressed in depth below, I note here that the ALJ provided more than a dry retelling of the facts, offering actual reasons for his conclusions. The ALJ canvassed the evidence, explicitly noting that many tests returned with normal results and that examinations uncovered no abnormalities. (Tr. at 18.) He offered explanations for his credibility findings including Plaintiff's daily activities, his work history, and the conservative treatment her received. (*Id.*) These go beyond the boilerplate conclusion described below and give reasons satisfying the narrative discussion requirement of SSR 96-8p. Moreover, the ALJ bolstered his rationale by describing Dr. Lazzara's and Dr. VanderHaagen's similar findings, which were the only medical opinions in the record. (Tr. at 18-19.) For his part, Plaintiff fails to suggest the alternative analysis the ALJ should have constructed. He points to his own statements concerning shortness of breath and edema, but he does not show how these were supported in the record, how they contradict the ALJ's analysis, what additional limitations they would impose besides daily leg elevation, or why those limitations would render him

---

[6] He also stayed overnight in August 2009 when he coughed up blood. (Tr. at 285.)

33

disabled. *Cf.* Adams, 2011 WL 2560688, at *3 (rejecting claimant's similar argument where she "simply argues that the discussion was insufficient, but points to no evidence that conflicts with the ALJ's mental RFC assessment, nor explains how she was prejudicied by the ALJ's failure to discuss the issue more thoroughly"). Therefore, I suggest that the ALJ's discussion was adequate.

### iii.    RFC Analysis

Plaintiff's RFC argument is similarly unpersuasive. It begins by noting that "[t]here is not one non-exertional limitation in the ALJ's RFC." (Doc. 12 at 11.) This is inaccurate. Exertional limitations deal only with "the strength demands of jobs," whereas non-exertional limitations include all other restrictions on the claimant's ability to meet the demands of jobs . . . ." 20 C.F.R. §§ 404.1569a(a)-(b), 416.969a(a)-(b). The latter group includes anxiety, depression, concentration, memory, comprehension, sight and hearing, environmental features such as dust or fumes, and manipulative or postural functions such as reaching or climbing. *Id.* §§ 404.1569a(c), 416.969a(c). The RFC here included numerous non-exertional limitations: a sit-stand option; reaching, climbing, crouching, kneeling, stooping, and crawling restrictions; and a limitation on exposure to dust and similar settings. (Tr. at 16.)

Most of Plaintiff's argument centers on symptoms he alleged, which were not substantially borne by the objective medical evidence that the ALJ discussed. (Doc. 12 at 11-12.) He contends that the ALJ ignored his "severe fatigue, severe pain, need to lie down, [and] severe medication side effects," along with his shortness of breath and numb left arm. (*Id.* at 12.) Other than Plaintiff's entirely self-diagnosed need to elevate his leg, Plaintiff never offers

any explanation of how these symptoms manifested in restrictions that the RFC should have encompassed.

The objective evidence, addressed by the ALJ (Tr. at 16-19), does not support greater limitations.[7] Plaintiff gave varying estimates of his difficulty walking, telling Dr. Lazzara he could walk 100 yards (Tr. at 349, 355), but testifying to the ALJ that the true number was twenty yards (Tr. at 50). The medical evidence, however, showed that his gait was invariably steady (Tr. at 261, 279, 310-11, 329, 353, 433-35, 485, 491, 507, 514, 525-26), and he stated at various times that he walked for exercise (Tr. at 244-45, 496-97, 512, 629) and also went hunting, fishing, and range shooting on occasion (Tr. at 196, 349.) All of these activities suggest a greater capacity for standing and ambulating than his estimates imply.

He also frequently complained of shortness of breath on exertion (Tr. at 243-44, 249, 491, 496-97, 513, 604, 612), yet denied it at other appointments (Tr. at 485, 521). When "some shortness of breath" was observed during a stress test, the doctor attributed it to his smoking rather than latent physical conditions. (Tr. at 402, 430, 536, 546.) Additionally, his breathing was consistently clear on examination. (Tr. at 244, 261, 279, 283, 302, 310-11, 329, 433-35, 491, 497, 507, 514, 519, 624-25.) Significantly, Dr. Lazzara undertook a second consultative examination just to investigate Plaintiff's cardiopulmonary system. (Tr. at 355-57.) After extensive testing, he determined that the "cardiopulmonary impairment appears mild . . . ." (Tr. at 357.) Tests of his strength and range of motion were likewise nearly always normal. (Tr. at

---

[7] "The court may consider evidence in the record, regardless of whether it has been cited by the ALJ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001)). *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). The analysis that follows merely plugs additional facts into the ALJ's analysis, it does not construct new rationales or arguments for the ALJ's action.

329, 350-53, 433-35, 525-26.) Indeed, Dr. Lazzara's report contains a thorough examination of his strength and flexibility and finds no abnormalities. (Tr. at 350-53.) Only one examination found that his left shoulder's range of motion was restricted (Tr. at 485), and the RFC adequately accounts for this by limiting his reaching with that arm. (Tr. at 16.)

The problems with his hand, particularly his grip, are unsubstantiated. He does not seem to have specifically, or at least consistently, told any doctor or nurse that he had manipulative difficulties with his left hand, aside from informing them of his general left-arm pain; these particular complaints appear in his self-report and his testimony. (Tr. at 38, 46-47, 192, 197.) Again, Dr. Lazzara's report is the only objective evidence on the matter, and it determined that his grip strength was intact and he could "pick up a coin and open a door." (Tr. at 350.) Similarly, Plaintiff's complaints of leg-swelling, or edema, are not matched by enough other evidence to justify a highly restrictive RFC. He told the ALJ the swelling and leg pain came from restless leg syndrome, as diagnosed by his doctors. (Tr. at 39.) That diagnosis does not appear in the record. Rather, when his legs were examined, no edema was discovered. (Tr. at 244, 350, 497.) Also, Plaintiff's brief faults the ALJ for not considering the "severe" effects of his medications. (Doc. 12 at 12.) Yet in his self-report form, he said the medications did not cause any side effects (Tr. at 199), and the record does not contain any other complaints of them.

He clearly has chest pain and this no doubt imposes limits on what he can do. But the ALJ was justified in deciding that those limits are not more severe than what is envisioned in the RFC. As noted, most of the record comes from routine appointments with his doctors rather than emergency room visits, overnight stays, or other episodes indicating critical health

36

struggles. Of course, a person can be disabled without crashing the emergency room every week; but the lack of critical episodes provides some evidence that his condition was relatively stable. And the objective evidence and medical opinions all suggest that this stable level did not impose debilitating functional restrictions. Though a stress test shortly after his surgery noted that his chest pain was "limiting" (Tr. at 582), it did not describe how or why.

Plaintiff also testified that he was never permitted to work post-surgery. (Tr. at 51.) This seems to reference his nurse's suggestion a few months after his surgery that he not work until his chest pain resolved. (Tr. at 515-16.) His reliance on this statement is unpersuasive for a few reasons. First, it is not a description of specific limitations that could be incorporated into the RFC; rather it is an opinion of temporary disability, without more, and this narrow decision is entrusted solely to the Commissioner. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Additionally, the nurse offering this opinion is not an "acceptable source," 20 C.F.R. §§ 404.1513(a), 416.913(a), which does not mean her input is suspect, but rather as described above, the regulations place limits on its persuasiveness. In fact, many of his reports come from this nurse and he seems to consider her to be his primary caregiver. (Tr. at 42.) The lack of support from "acceptable sources" further diminishes the force of Plaintiff's argument.

The tests and examination results support the ALJ's analysis. His heart rate and rhythm were usually regular, only sometimes measuring slightly slower, and diagnostic examinations were normal as well. (Tr. at 244, 268, 319-20, 329, 331-32, 350, 402, 427, 430-31, 497, 510, 514, 519, 525-27, 531, 541-42, 544.) As noted, Dr. Lazzara offered the only direct, examining "acceptable" medical source opinion in the record; he concluded that other than "borderline" blood pressure elevation, Plaintiff did not have "other findings of heart failure" and attributed

his chest pain to COPD. (Tr. at 353.) Reviewing Plaintiff's records, Dr. VanderHaagen noted that Plaintiff's coronary artery disease was relatively stable, as evidenced by the only "slightly decreased" ejection fraction. (Tr. at 69-70, 78-79.)

The ALJ accounted for Plaintiff's impairments to the extent the evidence warranted. The sit-stand option acknowledges Plaintiff's complaints of leg pain and respiratory issues, the reaching limitation reflects Plaintiff's subjective statements, and the limitation on environmental hazards addresses his respiratory difficulties. The restrictiveness of the exertional limitation—lifting no more than twenty pounds—exceeds Dr. Lazzara's proposed forty-pound limit. (Tr. at 347.) In short, I suggest that the RFC is sufficient.

### iv.     Credibility Analysis

As with his RFC argument, Plaintiff's credibility contentions fail to do more than state what the ALJ did not do, rather than what he should have done. (Doc. 12 at 12-13.) According to Plaintiff, the ALJ disregarded his testimony about chest pain, left-arm numbness, shortness of breath, and the need to elevate his legs. (*Id.* at 12.) The ALJ did not ignore this evidence, but rather gave a sound explanation for questioning it. The decision considers all of these subjective complaints (Tr. at 17) before describing in detail the medical evidence that largely contradicted the severity of the pain and other problems Plaintiff claimed to experience. (Tr. at 18.) He then offered specific reasons for his credibility determination: Plaintiff's daily activities, including his ability to do chores, outdoor work, drive, shop, and handle personal care; his "routine and conservative [treatment] with minimal examination and diagnostic findings"; and his work history of "limited to less than substantial gainful activity, which raises a question as to whether the claimant's continuing unemployment is actually due to medical

impairments." (*Id.*) These findings match the regulatory factors required in credibility analysis, 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

I suggest that the ALJ not only cited substantial evidence, but could have cited even more from the record. While daily activities usually are not a good indicator of a claimant's functional capacity, *see, e.g.*, *Barker-Bair v. Comm'r of Soc. Sec.*, No. 1:06-CV-00696, 2008 WL 926569, at *11 (S.D. Ohio Apr. 3, 2008) ("It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment."), here these activities included outdoor maintenance work; and for recreation, he hunted, fished, and shot at a range. These are more intensive activities and indicate greater functional abilities than Plaintiff claimed. Additionally, he told the ALJ that he stopped working after his heart attack in 2008, yet notes from August 2009 report that he had stated he was working part-time. (Tr. at 278.) Also, assuming the VA scale was out of ten, his estimates of his pain level were generally low—at level four or less—even when he was seeking treatment rather than simply following up. (Tr. at 249, 279, 328, 433, 631.) Thus, I suggest that substantial evidence supports the ALJ's credibility determination.

The ALJ's use of unfortunately-phrased boilerplate does not change this conclusion. The decision states that Plaintiff was not credible "to the extent [his assertions] . . . are inconsistent with the above residual functional capacity assessment." (Tr. at 17.) This suggests that the ALJ first determined the RFC, then gauged Plaintiff's credibility by it. The language is inartful at best, and a complete mangling of the required analysis at worst. *See Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012) (describing, as Judge Richard Posner put it, how the court "stubbed our toe on a piece of opaque boilerplate" that misconceives the regulations).

Had the ALJ's analysis here proceeded along that twisted path, I would be tempted to recommend granting Plaintiff's motion. But, as noted above, it did not. Instead, the ALJ discussed evidence touching on each credibility factor in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### v.   Medical Opinion Analysis

It is not apparent that Plaintiff even intended to raise the medical opinion argument as a separate claim; it consists of two sentences, tacked to the end of an otherwise unrelated paragraph, addressing the ALJ's reliance on Dr. VanderHaagen's opinion. (Doc. 12 at 11-12.) Those sentences state: "The ALJ completely relies on the medical opinions of the medical consultant Dr. VanderHaagen, a doctor hired by the [Social Security Administration] to deny Plaintiff's claims. This is legal error." (*Id.*) This could mean one of two things. First, Plaintiff could be arguing that Dr. VanderHaagen's opinion was ill-founded for the reasons described above, thus the ALJ should not have used it. If this is his contention, it fails for the reasons already addressed.

He may instead mean that relying on a consultant hired by the Commissioner is error and that here, the ALJ did not use any other evidence—he "completely relies" on Dr. VanderHaagen. This is incorrect. The ALJ clearly cited other evidence to support his findings; he did not, as is implied, hang his decision on this lone piece of evidence. Moreover, reviewing consultants hired by the Social Security Administration are not only permissible sources, but are deemed experts by the Commissioner, and their opinions can sometimes merit "greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3 (1996); *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)

40

("Certainly, the ALJ's decision to accord greater weight to state agency physicians over Blakeley's treating sources was not, by itself, reversible error."). I therefore recommend rejecting this argument.

### iv.      Medical Guidelines—The Grid

Finally, Plaintiff contends that the ALJ misapplied the Medical Guidelines and should have instead used his discretion to treat Plaintiff as older than his years, thus putting Plaintiff in a different Guideline category that would have required finding him disabled. (Doc. 12 at 13-14.) Again, he provides scant argument, citing only one regulation in support. I suggest that the ALJ was under no obligation to follow this path and instead properly used the Guidelines as a "framework."

The Guidelines, sometimes called the "Grid," provide a series of rules that analyze claimants based on age, education, previous work experience, and exertional capacity. They give definite and mandatory outcomes—disabled or not—if the claimant precisely meets one of the various combinations of these criteria. 20 C.F.R §§ 404.1569, 416.969. The Commissioner will not apply the Guidelines "if one of the findings of fact about the person's vocational factors and residual functional capacity is not the same as the corresponding criterion of a rule." *Id.* Specifically, they are inapplicable if the claimant has non-exertional limitations and the Guidelines would not find the claimant disabled "based on [her] strength limitations alone . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2). For example, if a Guideline rule would require a finding that Plaintiff is disabled based on his strength and age, it should not matter that he has additional non-exertional limitations that further erode the job base—the Commissioner can find him disabled "based on [his] strength limitations alone . . . ."

41

*Id.*; *see also Justiniano v. Comm'r of Soc. Sec.*, No. 6:11-cv-1576, 2013 WL 625545, at *6 (M.D. Fla. Feb. 20, 2013) (same); *Wirth v. Barnhart*, 318 F. Supp. 2d 726, 734 (E.D. Wis. 2004) ("'When a claimant has presented both strength and nonexertional limitations, the Secretary is to decide whether a finding of disabled may be possible based on strength limitations alone.'" (quoting *Odierno v. Bowen*, 655 F. Supp. 173, 185 (S.D. N.Y. 1987))). Where the Guidelines do not apply directly, they nonetheless serve as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2).

Further background on the Guidelines is useful to understand Plaintiff's argument. The Guidelines have developed in a somewhat whack-a-mole manner, addressing one concern while others popped up as a result. In short, the Guidelines were developed to prevent discrepant treatment of claimants; but to head off the resulting possibility of formalistic application of these rules, the regulations require that the Guidelines' provisions on the claimant's age not be applied mechanically. But this anti-mechanical regulation would mean nothing if courts could not review whether the ALJs decision was mechanistic. Consequently, some courts require ALJs to explain why they adhered to the Guidelines—and considered the claimant to be her actual chronological age—rather than depart from them. The Sixth Circuit has not imposed this explanation requirement.

Before they were first promulgated in 1978, the Commissioner exclusively "relied on vocational experts to establish the existence of suitable jobs in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461 (1983). The testimony "often was based on standardized

42

guides," but the practice drew criticism for its "inconsistent treatment of similarly situated claimants." *Id.* The Guidelines thus were crafted to ensure greater uniformity. But bright-line rules, rather than standards, come with their own problems, particularly the threat that they will be read with wooden formalism. For an example germane to the present case, consider the Guidelines classifying claimants based on age categories, which can be determinative. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(d)-(h). If a decision is rendered the day before a claimant's birthday to deny benefits, and the Guidelines would direct a different result had the decision come a day later, it might not make sense to adhere strictly to the Guidelines. To discourage such a scenario, the regulations instruct ALJs to

> not apply the age categories mechanically in a borderline situation. If [the claimant is] within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disable, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. §§ 404.1563(b), 416.963(b).

The Commissioner's internal manuals—the *Hearings, Appeals, and Litigation Law Manual* ("HALLEX") and the *Programs Operations Manual System* ("POMS")—lay out the process for making this determination, though these documents "do[] not impose judicially enforceable duties on either this court or the ALJ." *Lockwood v. Commission*, 616 F.3d 1068, 1073 (9th Cir. 2010). They prescribe a two-part test for identifying "a borderline age situation": (1) Is claimant within a few days or months of the next higher age category; and (2) if so, would that higher age category would "result in a determination of 'disabled' while using the claimant's chronological age would result in a determination of 'not disabled[.]'" Soc. Sec.

43

Admin., *POMS*, DI 25015.005 (April 22, 2011);[8] *see also* Soc. Sec. Admin., *HALLEX*, § II-5-3-2 (Nov. 2, 1993).[9] If the answer to both is "yes," then the borderline age situation is present and the ALJ must decide whether to use the higher age category. *Id.* This decision is to be made under a "sliding scale" approach where the "claimant must show progressively more additional vocational adversity(ies)—to support use of the higher age—as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens." Soc. Sec. Admin., *POMS*, DI 25015.005. These "adversities" are "additional impairment[s] which infringe[] upon—without substantially reducing—a claimant's remaining occupational base," such as frequent stooping limitations for a claimant with a sedentary RFC. Soc. Sec. Admin., *HALLEX*, § II-5-3-2.

The regulation thus gives the ALJs a way out of making a formally correct, but realistically oblivious, decision. Whether it demands anything more of the ALJs, such as that they make a certain decision on this issue or at least explain whatever decision they make, is not only at the center of this case but also a debate across circuits. That is, must the ALJ explicitly justify his decision to, for example, treat a fifty-four year old as being fifty-four years old rather than fifty-five? The manuals diverge when discussing whether the ALJ needs to explain the decision: the *Hallex* states that an ALJ "need not explain his or her use of the claimant's chronological age," *id.*, whereas the *POMS* asserts that "[w]hen a borderline age situation exists, you must explain your decision to use the next higher age category or your decision to use the claimant's chronological age . . . ." Soc. Sec. Admin., *POMS*, DI 25015.005.

---

[8] Available at https://secure.ssa.gov/poms.nsf/lnx/0425015005.
[9] Available at http://ssa.gov/OP_Home/hallex/II-05/II-5-3-2.html.

Some courts have found that without such an explanation, the court is left with no way to review the decision to apply either age category. This is because the option of veering from a chronological age category is a decision the ALJ must sometimes make, based on 20 C.F.R. §§ 404.1563(b), 416.963(b). A few circuits have reasoned from this that in order to review this regulatory-imposed determination, the ALJ must give some indication of how she made it. The Eighth Circuit explained that "detailed findings in borderline situations are not necessary. However, it is this court's job to review whether substantial evidence exists to support the Commissioner's decision, and we simply cannot complete this review without some showing as to the Commissioner's consideration of applying the higher age category, which he indisputable is required to do." *Phillips v. Astrue*, 671 F.3d 699, 706 (8th Cir. 2012); *see also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 404 (6th Cir. 2008) (Moore, J., dissenting) ("We cannot review on appeal whether the ALJ [applied the grid mechanistically] . . . if the ALJ gives absolutely no indication whether he or she even considered the claimant's borderline status."); *Lucas v. Barnhart*, 184 F. App'x 204, 208 (3d Cir. 2006) (remanding for lack of substantial evidence because "the record does not contain factual findings relevant to the § 404.1563(b) inquiry"); *Cox v. Apfel*, 166 F.3d 346, 1998 WL 864118, at *4 (10th Cir. 1998) (unpublished table decision) (finding error where the ALJ did not address the borderline age inquiry); *Zent v. Astrue*, No. 1:10-cv-80, 2011 WL 1458481, at *3 (N.D. Ind. Apr. 15, 2011) (noting that while the Seventh Circuit has not addressed the issue, the few lower courts in the Circuit that have taken it up generally reverse where the ALJ does not consider the matter). These courts do not require much of an explanation, however, and indicate that "a mere statement by the Commissioner that he considered the borderline situation would likely

45

suffice." *Phillips*, 671 F.3d at 706; *see also Bowie*, 539 F.3d at 404 (Moore, J.) ("[A]t a minimum [the ALJ] has to note that he considered whether to do so in a non-mechanistic manner."). Taking a modified approach, the Ninth Circuit finds it sufficient if the ALJ mentions the claimant's date of birth, age category, and cites §§ 404.1563, 416.963. *Lockwood*, 616 F.3d at 1072.

Fortunately for the Court, the Sixth Circuit has provided clear, direct, and binding guidance on this point. In *Bowie v. Commissioner of Social Security*, the ALJ did not address the borderline age situation, but the court rejected the plaintiff's argument that "the ALJ is required to acknowledge . . . borderline status explicitly and to make an explicit determination . . . ." 539 F.3d at 399. Acknowledging that the "ALJ may need to provide, in cases where the record indicates that use of a higher age category is appropriate, some indication that he considered borderline age categorization in order to satisfy a reviewing court that his decision is supported by substantial evidence," the court nonetheless found that "§ 1563(b) does not impose on ALJs a *per se* procedural requirement to address borderline age categorization in every borderline case." *Id.* The court also noted that the regulations do not require such an explanation: Nothing in them "obligates an ALJ to address a claimant's borderline age situation in his opinion or explain his thought process in arriving at a particular age-category determination." *Id.* The situations possibly needing explicit investigation were those where the claimant had significant additional vocational adversities, as defined in the *Hallex* and the *POMS*.

Courts in this circuit have consistently applied this reasoning. *See Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510, 516-18 (6th Cir. 2011) (applying *Bowie* and finding that the

ALJ's discussion was sufficient, though not addressing whether the ALJ needed to discuss it at all); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 528 (6th Cir. 2006) (finding no error where the ALJ failed "to explicitly mention the sliding scale" from the *Hallex*); *Antio v. Comm'r of Soc. Sec.*, No. 08-CV-14933, 2010 WL 779265, at *9 (E.D. Mich. Mar. 8, 2010) (adopting Report & Recommendation) (rejecting claim that the ALJ should have treated the claimant in a higher age category despite the ALJ's failure to "explicitly address the issue," noting also that the ALJ "set forth Plaintiff's birth date and age in his decision and cite[d] the applicable regulation.").

Here, Plaintiff argues that the ALJ should have veered from the Guidelines' age category and placed him in a higher category. (Doc. 12 at 13-14.) The most he could reasonably hope for, however, is to reverse and remand because the ALJ did not explicitly address the borderline situation: There is no requirement that the ALJ actually use his discretion to depart from the Guidelines. Even if the ALJs in this Circuit were required to discuss the issue, the decision here might suffice. The ALJ cited Plaintiff's birthdate, age on the alleged disability onset date, age category under the Guidelines, and regulations 20 C.F.R. §§ 404.1563, 416.963. That passes muster under more strenuous tests, such as Ninth Circuit's.

According to Plaintiff, the borderline situation arose because the ALJ issued his decision less than two months before Plaintiff turned fifty-five. (Doc. 12 at 13-14.) Treated as a fifty-four year old, the ALJ found that Plaintiff would have fallen under Grid Rule 200.13: He was "[c]losely approaching advanced age," which is the category that covers ages fifty to fifty-four, 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(g); he was limited to light work; he was a high school graduate; and his previous work experience was at the unskilled level. (Tr. at 19-

47

20.) This would have resulted in a determination that Plaintiff was not disabled, but the ALJ found non-exertional limitations and thus could use the Grid only as a framework. (*Id.*) Plaintiff contends that had the ALJ not applied the Grid mechanistically, he would have treated Plaintiff as fifty-five years old (Doc. 12 at 13-14) and in the "advanced age category." Under Grid Rule 202.04, he would have been considered disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.04. The only different between these two Rules, aside from the age category, is that the Rule 202.13's education level states, "High school graduate or more," whereas Rule 202.04's level states, "High school graduate or more—does not provide for direct entry into skilled work." The distinction appears irrelevant: Both are concerned with the inability to translate a remote high school education into present vocational skills. *Id.* § 202.00(c).

Assuming this is a borderline scenario, Plaintiff's case did not come close enough under *Bowie*—which anticipated that some scenarios might require explanation—to warrant further comment on the borderline situation. Plaintiff's brief puts forth no additional vocational adversities that Plaintiff suffers and that render application of his chronological age a mechanistic use of the Grid. Perhaps his limited work history in maintenance and disc jockeying would constitute a relevant adversity. Soc. Sec. Admin., *HALLEX*, § II-5-3-2 (noting that a potential adversity is "hav[ing] a history of work experience in an unskilled job(s) in one isolated industry or work setting"). However, Plaintiff's two jobs span across very different industries—outdoor maintenance supervision and entertainment (Tr. at 204-06, 227), suggesting he has some versatility, and in any case, Plaintiff does not describe how this work history would infringe upon his occupational base. Soc. Sec. Admin., *HALLEX*, § II-5-3-2.

Nor does Plaintiff display many of the possible adversities set out in the *POMS*, such as frequent postural limitations, visual limitations, or hearing problems. Soc. Sec. Admin., *POMS*, DI 25015.005. The RFC, which Plaintiff has not shown to be incomplete, includes a few limitations that might be considered adversities (Tr. at 16), but again, Plaintiff does not explain how these interact to erode his occupational base. The RFC is relatively conservative and the ALJ could justifiably conclude that despite Plaintiff's impending birthday, and the consequent change of age categories, the VE's testimony accurately reflected the occupational base available to Plaintiff.

Plaintiff has not produced any substantial argument why the ALJ should have raised his age category. Thus, I suggest that the ALJ was not obligated to discuss the potential borderline situation and that, if he were, his citation to Plaintiff's age, birthdate, and the relevant regulation suffice to show that he adequately considered the issue.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: April 17, 2015

S/ Patricia T. Morris
Patricia T. Morris
United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 17, 2015                    By s/Kristen Krawczyk
                                        Case Manager to Magistrate Judge Morris